```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF DELAWARE

 3

 4    ICON HEALTH & FITNESS, INC.,      )
                                        )
 5                       Plaintiff,     )
                                        ) C.A. No. 20-1386-RGA
 6    v.                                )
                                        )
 7    PELOTON INTERACTIVE, INC.,        )
                                        )
 8                       Defendant.     )

 9

10                                    Monday, December 21, 2020
                                      Oral Argument
11                                    Videoconference
                                      2:01 p.m.
12

13    BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

14    APPEARANCES:

15                 RICHARDS LAYTON & FINGER, P.A.
                   BY:  FREDERICK L. COTTRELL, III, ESQUIRE
16                 BY:  CHRISTINE D. HAYNES, ESQUIRE

17                        -and-

18                 MASCHOFF BRENNAN
                   BY:  STERLING A. BRENNAN, ESQUIRE
19                 BY:  DAVID R. WRIGHT, ESQUIRE
                   BY:  TYSON K. HOTTINGER, ESQUIRE
20
                                      For the Plaintiff
21

22

23

24

25
```

```
 1    APPEARANCES CONTINUED:

 2              MORRIS NICHOLS ARSHT & TUNNELL LLP
              BY:  MICHAEL J. FLYNN, ESQUIRE
 3
                        -and-
 4
              HUESTON HENNIGAN LLP
 5            BY:  STEVEN N. FELDMAN, ESQUIRE
              BY:  SOURABH MISHRA, ESQUIRE
 6            BY:  KAREN YOUNKINS, ESQUIRE

 7                               For the Defendant

 8
                    ***  PROCEEDINGS  ***
 9

10              THE COURT:  All right.  Good afternoon.  This is

11    Judge Andrews in ICON vs. Peloton, Civil Action Number

12    20-1386.

13              I see my deputy clerk on the line.  Can you hear

14    me?

15              DEPUTY CLERK:  Yes, Judge.

16              THE COURT:  And is my court reporter on the

17    line?

18              THE REPORTER:  Yes, Judge.

19              THE COURT:  All right.  So as I understand it,

20    the plaintiff here wants to put on an expert.  So I allotted

21    an hour for this, and so basically I'm going to keep track

22    of the time.  And I'm going to turn it over to the

23    plaintiff.

24              MS. HAYNES:  Good afternoon, Your Honor.

25    Christine Haynes from Richards Layton on behalf of the
```

1    plaintiff, ICON Health & Fitness.  Fred Cottrell is also on

2    the line from my office as well as my co-counsel, Sterling

3    Brennan, David Wright, and Tyson Hottinger from the Maschoff

4    Brennan firm.

5                THE COURT:  All right.

6                MR. FLYNN:  Good afternoon, Your Honor.  It's

7    Michael Flynn from Morris Nichols.  And with me on behalf of

8    defendant, Peloton Interactive, is Steven Feldman, Sourabh

9    Mishra, and Karen Younkins from Hueston Hennigan.

10               MR. FELDMAN:  Good morning, Your Honor.

11               THE COURT:  All right.  So plaintiff, what are

12   you going to do here?

13               MR. WRIGHT:  Well, Your Honor, my name is David

14   Wright.  I'm with the law firm of Maschoff Brennan, and

15   we're going to try to move through this as quickly as we

16   can.  We think it's important enough for Your Honor to hear

17   from Dr. Easttom that we will try and be concise and focused

18   in how we present this.

19               THE COURT:  Okay.

20               MR. WRIGHT:  I'll be handling the argument if

21   that's okay.

22               THE COURT:  Yeah.  Sure.

23               MR. WRIGHT:  So ICON's '062 patent, the patent

24   at issue, is directly to remotely control fitness equipment,

25   a feature that allows home users to more immersively limit

1    the experience of exercising --

2            THE REPORTER:  I'm sorry, Your Honor, but I'm

3    having trouble hearing.

4            THE COURT:  Yeah, counsel, for some reason or

5    another, you're not coming through very loud.

6            MR. WRIGHT:  Can you hear me better now?

7            THE COURT:  I can.

8            MR. WRIGHT:  Okay.  Thank you.  I'll start over

9    then.

10           THE COURT:  Well, no.  I don't -- okay.  Yeah,

11   go ahead.

12           MR. WRIGHT:  Well, I won't.  So the '062 patent

13   is directed to remote control and ICON'S patent portfolio,

14   which includes the '062 patent, has provided exclusivity to

15   ICON for the remote control fitness equipment industry until

16   Peloton launched its Bike+ product on September 8th of this

17   year with an infringing Auto-Follow resistance feature.

18           Now, in ICON's motion, we understand that it

19   is -- we're asking for extraordinary relief that should only

20   be granted in unusual circumstances.  But we believe that

21   ICON has met its burden, and that Peloton's conclusory

22   recitation of defenses lacks merit.

23           What the circumstances in this case present to

24   justify the unusual and extraordinary relief sought by ICON

25   is that there is a perfect storm of harm to ICON that has

1    been created by Peloton's infringement which warrants an

2    indirect injunction.  There is unprecedented demand for

3    at-home connected fitness products created in part by a

4    global pandemic.  ICON and Peloton are fierce competitors in

5    this at-home connected fitness market.

6              According to Peloton --

7              THE COURT:  So it seems to me you're just

8    reading the summary of your brief.  I did read the briefs.

9              MR. WRIGHT:  Okay.  Well, thank you, Your Honor.

10   I'll try and make it sound like I'm not reading a summary of

11   the brief.

12             If we look at this slide that we have on the

13   power-point, this shows the impact of the global pandemic on

14   the connected fitness market.  For March 2020 through

15   September, Peloton's subscriber bases doubled from 886,000

16   to over 1.3 million.  Workouts have been up 333 percent, and

17   average workouts per month have more than doubled.

18             ICON, similarly, has experienced the same

19   consumer behavior.  The pandemic has accelerated demand for

20   at-home connected products.  Now, this backdrop of

21   unprecedented demand is important in understanding the

22   economic realities of the market in which Peloton's Bike+

23   and ICON compete and the impact of that harm to ICON from

24   Peloton's infringement.

25             And why is this important?  When addressing

1    irreparable harm and the inextricable concept of causal

2    nexus, the Federal Circuit has consistently held that in a

3    two-player market involving direct competitors, that loss of

4    sales which directly equate to loss of market share

5    "strongly militates towards a finding of irreparable harm."

6    And that's the *Apple v. Samsung* case from 2015, 809 F.3d 633

7    at 653 through 54.  That is a reason by the Federal Circuit

8    in the *Apple v. Samsung* case in a two-player market that has

9    unique market conditions, such as that presented here, that

10   there's a direct correlation between lost sales and lost

11   market share.

12           In addition, in such economic conditions that

13   are unique to those markets, there's an ecosystem, a network

14   effect that make it such that a single sale of an infringing

15   product has a far reaching impact.  Accordingly, harm and

16   two-player market is "very difficult to calculate" in making

17   damages -- in determining whether damages are an adequate

18   remedy.

19           And this includes for convoyed sales.  And we

20   cited the Toro case in our briefs, Your Honor, that

21   specifically says that this ecosystem effect makes it very

22   difficult, if not impossible, to determine loss of sales.

23           And as Your Honor will appreciate, this

24   ecosystem effect is certainly one of the things that Peloton

25   has argued as a demand driver in this case.  In fact, they

1    have suggested to Your Honor that it's the primary demand

2    driver.

3              So that very ecosystem effect also applies to

4    ICON's harm.  And what that means in our industry is that

5    given the expected lifetime of each subscriber to ICON and

6    Peloton, so that's a nine or a 13-year relationship with a

7    subscriber, that ecosystem and network effect in this case

8    is even much more pronounced than it was in the *Apple v.*

9    *Samsung*.

10             Now, Peloton's primary argument rebutting the

11   presence of irreparable harm in this case has been rejected

12   by the Federal Circuit in the *Apple v. Samsung* and other

13   case law that we cited.  And the economic realities, as

14   reflected in Peloton's own documents, demonstrate a story

15   that I think demonstrates the application of that two-player

16   market.

17             And if we could have the next slide.  In

18   describing the fitness industry as a whole, and Your Honor,

19   we've put the citation to the documents at the bottom of the

20   slides.  This was from Peloton's own internal documents, and

21   it states that -- and this is a reflection of the industry

22   as a whole -- go back one slide, please -- where Peloton

23   acknowledges that "our main competitors exist in this

24   space," meaning the at-home connected fitness market.  It is

25   only in this market that Peloton specifically measures

1    market share of its competitors.

2              In litigation before this Court, Peloton

3    recognized that ICON is a direct, not a trivial competitor

4    in this at-home fitness market.  And Peloton's CEO in this

5    case acknowledged under oath that ICON is a direct

6    competitor in the at-home fitness market.

7              In its public filings with the SEC, Peloton

8    acknowledges that it competes in a market which it describes

9    to investors as "connected technology enabled fitness"

10   market.

11             Now, as I said, when it does measure market

12   share in this relevant market, the at-home connected fitness

13   market, Peloton recognizes that ICON is a direct competitor

14   and that market share gained or lost is always to the

15   benefit or loss of ICON.  This is a document that was

16   prepared as of May 30th showing market share in the market

17   they considered to be where their relevant competitors are.

18             And it said, as of that date, Peloton still

19   commands two-thirds of the market.  In this case, 65 percent

20   as you see on May 30th.  Whereas, ICON has 23 percent.

21             And then it's Peloton's own words, it states,

22   but ceded ground in recent weeks, particularly to ICON.  And

23   as you can see, Your Honor, in Peloton's data, it reflects a

24   two-player market.  Ninety percent of the market is

25   controlled by these two players.

1        So the very principles outlined by the Federal

2   Circuit in *Apple v. Samsung* certainly apply here and apply

3   even more because when you're fighting for a subscriber,

4   that relationship lasts for a very, very long period of

5   time, not just a one-time sale.  In Peloton's estimation,

6   that's 13 years.  In ICON's, that's nine years.

7        And these pieces of equipment are not cheap.

8   Over $1,500 for the lowest price of these competing

9   products.  So a consumer makes that initial investment and

10   then it continues on this ecosystem by both parties for a

11   substantial period of time.

12        Now, this next slide shows a different time

13   period ending August 22nd.  So this is right before

14   introduction of the infringing Auto-Follow feature in the

15   Bike+ product.  And according to Peloton's own words, ICON

16   has made gains in recent weeks reaching 23 percent market

17   share at the expense of Peloton.

18        Now, what happened after the release to this

19   market share data after the release of the infringing

20   Auto-Follow feature?  Well, from Peloton's own documents as

21   of September 2020 and its own words, "following the Bike+

22   launch, Peloton reached the highest level in six months as

23   ICON's ceded share.

24        Now, our expert, Mr. Nelson, in his supplemental

25   declaration took a look at this market share data and

1    prepared some graphs to show that there is a correlation in

2    market share loss and gain between Peloton and ICON.  This

3    is something you would expect to see in a two-player market

4    as outlined by *Apple v. Samsung*.

5              So when there's gain by ICON, there's loss by

6    Peloton.  When there's gain by Peloton, there's loss by

7    ICON.

8              So the red graph or the red line, Your Honor,

9    represents ICON.  According to Peloton's own documents,

10   that's ICON's market share.  The blue line represents

11   Peloton.  The orange line is an adjusted ICON share to show

12   that the other players in the market don't really move the

13   needle very much, that this is, in fact, a two-player

14   market.  So that's adjusted so that the Court can see the

15   direct correlation between these two players in the market

16   that Peloton claims to be the most relevant.

17             Now, the next graph prepared by Mr. Nelson shows

18   in an inverse sort of way that gain and loss in market share

19   so that it's easy to see visually that correlation.  Now,

20   this is what you would expect to see in a two-player market.

21   And Your Honor, that ecosystem and network effect outlined

22   by the *Apple vs. Samsung case certainly applies here in*

23   *supporting a finding of irreparable harm.*

24             *Now, let me comment a moment on the concept of*

25   *nexus.  As the Court knows from the Apple v. Samsung line of*

1   cases, the demand driver or the primary demand driver is not

2   what satisfies the nexus.  What is required for ICON to show

3   is that some connection exists between the alleged harm and

4   the patented remote control feature.  In other words,

5   whether this feature impacts customer purchasing decisions

6   or otherwise makes ICON's or Peloton's products more

7   desirable.

8            Let's take a look at three types of evidence

9   that we've cited in our briefs.  The first is third-party

10  reviewers.  What do they have to say about the Auto-Follow

11  feature?  They said it was the raddest of all, that it was a

12  game-changer.

13           Peloton's own documents refer to the Auto-Follow

14  feature as a key document internally and, in fact,

15  instructing those that interact directly with consumers,

16  they say that they encouraged them to highlight this new key

17  feature when they interact with consumers.

18           And that's not all.  In the letter to

19  shareholders, not just internally, but to its shareholders

20  it says in introducing the Auto-Follow for the Bike+ product

21  that the Bike+ has two new features, including Auto-Follow,

22  a feature that automatically scales your resistance based on

23  the instructor's Target Metrics.

24           So according to Peloton's own documents, this

25  feature makes their product more desirable.  That

1     desirability has been recognized by third-party reviewers.

2            And what's even more telling, Your Honor, is

3     ICON routinely using a platform available to it does sort of

4     consumer insight research.  And we produced one of these

5     consumer research -- consumer insight research studies that

6     showed the connection or the demand driver that the remote

7     control feature represents.

8            Now, let me explain.  The slide you're seeing is

9     a -- it reflects the results of this survey that was

10    conducted -- I think completed on November 16th.  It sent --

11    ICON sent out over 330,000 cards to folks that have

12    purchased its product, its S22i product that competes with

13    Peloton prior to Peloton's introduction of the Bike+.  So

14    this is before the Auto-Follow feature existed in the

15    marketplace, and over 2,400 people responded to that.

16    That's a statistically significant number.

17           And of those folks that responded, 92.5 percent

18    said as part of their decisionmaking process, they also

19    considered the Peloton product.  That's significant.

20           And then they were asked:  What were the most

21    important features to you in that consideration?  And the

22    number one feature, the most important differentiating

23    feature scoring the highest of all features was the

24    automatic trainer control resistance or this remote control,

25    the number one feature.  So to suggest that there is no

1    nexus between the remote control feature and the demand

2    misunderstands the evidence that has been presented.

3              Now, let me just speak -- and I need to add that

4    the most important -- this most important differentiator has

5    been lost because of Peloton's infringement.  ICON has lost

6    the advantage of having this differentiator and is faced

7    with the prospect of competing against its own patented

8    technology.

9              Now, a brief word about hardships, Your Honor.

10   We have a slide in here that lists the secondary

11   considerations.

12             But briefly on hardship, these same -- Peloton

13   wants the Court to believe that the hardships tip in its

14   favor, but that's not true.  We've asked -- what we've asked

15   for is very narrow.  We're not asking for an injunction

16   against sale of the Bike+ product.  We're only asking that

17   the Auto-Follow feature be turned off, that that infringing

18   feature not be used.

19             And --

20             THE COURT:  Is that technically possible?

21             MR. WRIGHT:  It is technically possible, Your

22   Honor.  We get updates on IOS.  Apple sends an update to its

23   IOS routinely to its firmware.  Just turning that feature

24   off is something that our expert testified could happen

25   easily.

1          But more importantly, their CEO -- the COO of

2     the company, Mr. Cortese, testified that if Peloton were

3     required to turn the Auto-Follow feature off, it would have

4     little or no impact on price, on sales, or Peloton's

5     presence in the marketplace.

6          And with that, Your Honor, I'll turn the time

7     over to Mr. Hottinger who will discuss likelihood of success

8     on the merits.

9          THE COURT:  So before you do that, so part of --

10    so when did Peloton lower the price of the bike?

11         MR. WRIGHT:  So it lowered -- yeah, it lowered

12    it -- at the time that it introduced the Bike+, it lowered

13    the Bike price.  And that was September 8th of this year,

14    Your Honor.

15         THE COURT:  So is there something in the record

16    that explains in the capture of market share after

17    September 8th that how much of that is due to the Bike+ and

18    how much of that is due to the Bike?

19         MR. WRIGHT:  Well, Your Honor, you can see if

20    you go back to the slide number 3, there is a graph that

21    shows you the contribution of the Bike and the Bike+ to

22    Peloton's market share.  And in fact, the day after Bike+

23    was introduced, it was the second highest, two times highest

24    selling event in Peloton's history.

25         So the --

1           THE COURT:  So I'm looking at a slide, I can't

2    tell what slide number it is, but it has some blue in the

3    graph and some orange.  Are you telling me the orange is the

4    Bike+?

5           MR. WRIGHT:  Yes, if you look at the bottom of

6    the graph, orange on the -- it shows that orange is Bike+.

7    Blue is Bike.  And this comes from DI-47 which is

8    Malackowski's declaration at paragraph 98.

9           THE COURT:  Okay.  There was also reference in

10   your opening brief, I don't know that I saw too much of it

11   thereafter, saying that somehow or another the reduction in

12   price of the Bike was something that was permitted because

13   there was now the Bike+.  And I didn't actually understand

14   that, but it seemed like you were saying that the reduction

15   in price of the Bike is part of the harm that's being caused

16   to you here; is that right?

17          MR. WRIGHT:  Well, what impact that will have on

18   pricing in this market has not yet been shown.  But having

19   two products available to consumers with different price

20   points allowed and one being a premium product with the

21   Auto-Follow features allowed Peloton to then differentiate

22   in consumers' minds between two products and have a lower

23   price point.  ICON --

24          THE COURT:  Well, if they were to turn off the

25   Auto-Follow feature, they'd still call the Bike+ a premium

1  bike because of the improved graphics, and bigger screen,

2  and better music, and whatever else was on their

3  advertising.  Wouldn't that still allow for differentiation?

4         MR. WRIGHT:  It does.  In fact, Mr. Cortese

5  testified that removing Auto-Follow, in his view, who's

6  responsible for development of the product, would not affect

7  their pricing strategy.

8         THE COURT:  Okay.  I guess what I'm wondering,

9  in the opening brief I had the impression that you were

10  saying that the reduction in price of the Bike was some kind

11  of convoyed sale or something.

12         MR. WRIGHT:  Well, to the extent that becomes a

13  theory in a damages case for price erosion, we don't have

14  enough data yet to know that.  It certainly creates the

15  possibility for that and potential for that sort of harm,

16  and I think that's why Mr. Nelson referenced that in his

17  declaration.

18         THE COURT:  Okay.  All right.  If you want to

19  turn it over to the other fellow, that's fine.

20         MR. HOTTINGER:  Thank you.  Peloton is raising a

21  grounds for invalidity.  They're all based on obviousness.

22  The first two grounds rely on a reference called Watterson,

23  and Watterson does not qualify as prior art.  The basis for

24  that is set forth in ICON's brief.

25         And Peloton has not disputed that.  So

1   Dr. Easttom who we'll call here in a moment will cover

2   grounds three through five.  He has offered some opinions on

3   plain and ordinary meaning that are relative to this that

4   have been undisputed by Peloton.

5          I'd like to call Dr. Easttom as a witness now,

6   if that's okay, Your Honor.

7          THE COURT:  Sure.  You've got about eight

8   minutes.

9          MR. FELDMAN:  And Your Honor, yes, this is Steve

10  Feldman from Peloton.  I was just going to ask that, you

11  know, Peloton be granted equal time.  It's about 11:25, so

12  it seems like we have about five to seven minutes remaining

13  until it's half.

14         THE COURT:  Yeah.  We didn't start right on

15  time.  I'll keep track of the clock.  Thank you.

16         MR. FELDMAN:  Thank you, Your Honor.  I

17  appreciate it.

18         THE COURT:  Go ahead.

19         MR. HOTTINGER:  Your Honor, does the Court need

20  to swear Dr. Easttom or should I just proceed?

21         THE COURT:  Dr. Easttom, do you swear that you

22  will tell the truth?

23         THE WITNESS:  Yes, Your Honor, I do.

24         THE COURT:  Okay.  That's good enough for me.

25         William C. Easttom, II, after having been duly

1    sworn under oath, was examined as follows:

2                    MR. HOTTINGER:  Thank you.

3                    DIRECT EXAMINATION

4    BY MR. HOTTINGER:

5    Q.    Dr. Easttom, are your qualifications set forth in the

6    declaration that you've submitted in this case?

7    A.    Yes, they are in both declarations as well as the

8    attached CV.

9    Q.    And have you offered opinions in this case concerning

10   the plain and ordinary meaning for control signal remote

11   source over a network and proportional change?

12   A.    Yes, I have.

13   Q.    And where are those found in your declarations?

14   A.    I believe my second declaration paragraphs 83, 88 and

15   101 contain those opinions.

16   Q.    Thank you.

17              In your opinion, Dr. Easttom, does Studor render

18   claim 47 obvious in this case?

19   A.    Well, no, and for several reasons.  Studor itself is

20   an exercise bike that's connected to a computer and

21   connected to a monitor, as you can see on the slide.  The

22   first issue is Studor is very clear, all of those connecting

23   cables are not networking cables.  They don't form a

24   network.

25              Secondly, all of this is happening locally.

1    Now, what Studor was meant to do is to allow someone to go

2    out, record an exercise event like bicycling up a hill, and

3    along with that, record terrain characteristic information

4    such as altitude, temperature, wind speed, that sort of

5    thing.

6              Now, those terrain characteristic informations

7    are not operating parameters of a bike, and they couldn't

8    be.  Temperature certainly isn't an operating parameter.

9              What Studor does is it takes that terrain

10   characteristic information and on that local computer number

11   16, it first does data normalization.  And then it takes

12   that normalized data, puts it through a calculation or

13   produces a resistance that can then be used to control the

14   bike.

15             So we don't have anything remote.  We don't have

16   a network, and we don't have a packetized control system.

17             Now, I know that Studor mentions briefly moving

18   20 possibly, the media, outside to the Internet.  Studor is

19   very clear of only moving 20.  It says part of the computer.

20   Even if one were to do that, as I believe Dr. Almeroth

21   opined, what would be sent across the Internet would be that

22   terrain characteristic information which is not control

23   information.

24   Q.    Would it have been obvious to move computer 16 to a

25   network?

1    A.      In fact, Studor teaches against it for a couple of

2    reasons.  First one is all those cables I mentioned before

3    are non-network.  If you move 16 completely to the Internet,

4    now you have to re-engineer the interfaces of the computer,

5    the monitor, and the bike, as well as software and firmware

6    so that it now communicates over a network.

7           We also have to remember the time of the

8    invention.  If you put computer 16 out there on the

9    Internet, then all communications with the monitor or bike

10   are over the Internet.  That would have been simply

11   untenable at the time.

12          For example, in 1998, they just released the

13   56.6 dial-up modem.  One of ordinary skill in the art would

14   have known that putting 16 completely on the Internet, not

15   only would not have a reasonable expectation of success,

16   would have had a near guarantee of failure.

17   Q.      Does Studor teach proportional change as that term is

18   used in claim 47?

19   A.      Not at all.  What Studor teaches is a very vague

20   three different levels of easy to hard, easy, realistic, and

21   hard.  There's no suggestion in Studor that these are

22   percentages and no hint as to how one of ordinary skill in

23   the art might convert those to percentages.

24   Q.      And Dr. Easttom, does Brewer teach a proportional

25   change?

1    A.     No, Brewer is a device that has a small control

2    switch.  It's called a switch of 117 that allows you to pick

3    a level of one through ten.  Now, Brewer is very clear, one

4    is simply easy, and ten is simply more difficult.  There's

5    no suggestion that these are proportional or any sort of

6    percentage.  In fact, I have no idea, and neither would one

7    of ordinary skill in the art what exactly more difficult

8    means.

9           If Brewer had wanted to make this percentage, he

10   would have had to have done it zero to ten.  One to ten is

11   not a percentage.

12   Q.     Dr. Easttom, does Andrus teach a remote -- a

13   packetized signal from a remote source over a network?

14   A.     Well, Andrus is another one that's completely local.

15   What you have is a game console, a monitor and exercise

16   equipment literally designed to gamify a workout.

17          Now, the word remote appears in Andrus, but it's

18   referring to a remote control such as you might use to

19   control your television, which is certainly not remote in

20   the context of the '062 patent.  It's all in the exact same

21   room.  And again, Andrus, all the connections are using

22   non-network cables.

23   Q.     And does Andrus teach a proportional change?

24   A.     If anything, Andrus is even more vague than the other

25   prior art they've asserted.  It literally simply talks about

1    user effort with no indication of what that is.  There's no

2    hint or suggestion of a percentage.

3    Q.    And Dr. Easttom, you've also looked at Englehardt.

4    Does Englehardt teach a proportional change as that claim

5    language is used in claim 47?

6    A.    No, it doesn't.  I know Dr. Almeroth pointed to the

7    screen with the percentages on Englehardt.  What that is is

8    not a percentage change, it's a percentage of effort.

9          The way Englehardt works is if I want to

10   exercise, I pick this basic workout.  And all that chart is

11   telling me in Figure 8A is that at a certain point, I will

12   move from 60 percent of the effort to 70.  I can't control

13   it.  There's nothing I can change.  If I as a user with

14   Englehardt am uncomfortable going from 60 to 70, my only

15   option is to stop.

16   Q.    Thank you.

17         Dr. Easttom, do you understand what the term the

18   operating parameters in claim 29 is referring to?

19   A.    Well, yes, and it was quite clear to one of ordinary

20   skill in the art because just prior to that, the '062 talks

21   about one or more operating parameters.  One of ordinary

22   skill in the art would immediately see that the operating

23   parameters is referring to the one or more operating

24   parameters.

25   Q.    And Dr. Easttom, do you understand what the

1    proportional change from claim 47 is referring to?

2    A.       '062 is quite clear on that.  In fact, it gives a

3    lengthy example, and it uses 66 percent.  It makes it very

4    clear that proportional is percentage.

5    Q.       And same question in regards to the term, the phrase

6    a value representative of a proportional change of the

7    control signal.  Do you understand what that's --

8                MR. FELDMAN:  You're going to need to come up

9    here and set it up; right?

10               MR. MISHRA:  Yeah.

11               THE COURT:  Somebody needs to mute.

12               THE WITNESS:  I do understand what a value

13   representative of proportional change is.  That is a value

14   that represents a percentage change.

15               Now, it doesn't have to be the actual

16   percentage, it just has to represent it.  It could be the

17   actual percentage, but it doesn't have to be.  And it also

18   has to be something the user selects, not the computer.

19   It's not precomputed or calculated for them.

20   BY MR. HOTTINGER:

21   Q.       And what portion of the specification are you relying

22   upon for your opinion on the proportional change and a value

23   representative?

24   A.       One moment, please, because I have the specification

25   right here.

1    Q.     Is that reflected here in the slide, column 11,

2    lines 17 through 40?

3    A.     Yes, it is.  That is exactly what I was looking for.

4              MR. HOTTINGER:  Okay.  Your Honor, I'd like to

5    briefly address infringement, if that would be okay.  And I

6    would just submit that based on Dr. Easttom's testimony,

7    that Peloton's invalidity case lacks substantial merit.

8    They haven't raised a substantial question as to validity.

9    They're left with three challenges based on obviousness.

10   And their expert, Dr. Almeroth, provided nothing, but mere

11   conclusions as to how he reached his obviousness opinion.

12   He provided some brief testimony about what's in the

13   references and then made a conclusion, and it's unsupported.

14             You know, Peloton does argue that it's

15   practicing the Hickman patent.  And I'll note for the Court

16   that the Hickman patent '537 is not prior art.  Peloton

17   relied upon this in their opposition.  Their expert relied

18   upon the '537 patent.  That was confirmed in deposition

19   testimony.

20             Peloton's slightly trying to retract from that

21   and point to other Hickman patents, but the reality is

22   that's what they relied on.  But they're not practicing

23   Hickman for a few reasons.

24             First, they claim that the JSON information

25   that's sent to their Bike+ allows Auto-Follow to operate

1    totally locally like it would with a script.  Dr. Easttom

2    tested this theory, and it's wrong.  He ran two Auto-Follow

3    classes, one with a network connection and one without.

4           In the second test, Auto-Follow stopped working

5    when it didn't have a network connection.  You can see that

6    reflected here.  Same time period in the class and the

7    bottom slide resistance should be 32.  Auto-Follow does not

8    work when there's not a network connection, and that's

9    because the script discussed in the prosecution history are

10   different than JSON information that Peloton is using.

11          And that's clearly recognized by those of

12   ordinary skill in the art.  Scripts are independent

13   stand-alone canned programs.  They've been around forever.

14          ICON was loading them onto its machines from the

15   time it was sending them from the factory at Hickman. They

16   are executable.  That's a term of art that both Peloton and

17   ICON have agreed to that scripts are executable.  That means

18   that they're set.  They're a recipe.  They can be run on

19   their own.

20          The JSON information that Peloton is using is

21   dynamic, and it has to be dynamic because Auto-Follow allows

22   a user to adjust resistance during the class.  And that's

23   why they're not saving the JSON information to permanent

24   memory like is happening in Hickman because that information

25   needs to change.

1            And by definition, JSON information is not

2    executable by itself.  If you were to take JSON information

3    and try to implement it in the Hickman system, it would fail

4    because that JSON information is not executable, and that's

5    not disputed by any party here.

6            So what we have here left, Your Honor, is the

7    JSON information is undisputedly sent from a remote source

8    over a network, which is the Internet.  That is a packetized

9    second signal in the terms of the patent, and it is admitted

10   by Peloton that they use that JSON information to

11   automatically adjust resistance during the workout.  And it

12   is also shown that when a user selects an actual value of

13   resistance, that Peloton implements that through a precise

14   percentage which is demonstrated in Dr. Easttom's testing in

15   his supplemental declaration.

16           So admittedly, Peloton has a second packetized

17   control signal coming over from a remote source over a

18   network, and it is clearly not practicing Hickman.  ICON

19   never once in the prosecution history made a clear and

20   unambiguous statement that it was disclaiming JSON

21   information.  It was only discussing scripts which were well

22   known at the time, canned programs that do not allow a

23   dynamic adjustment like JSON does.

24           And with that, Your Honor, I would submit

25   Peloton has not come close to making a good case on

1    non-infringement.  Their non-infringement case lacks

2    substantial merit, and ICON has shown that it's likely to

3    succeed on its infringement case, Your Honor.

4                    Thank you.

5                    THE COURT:  All right.  Thank you, counsel.

6                    So I gave you, by my count, five extra minutes,

7    so I will give Peloton five extra minutes, too.

8                    I guess the first thing is whether or not

9    Peloton wants to cross-examine Dr. Easttom.  And I guess the

10   other thing I would say to Peloton is try to present your

11   arguments strongest first because it's possible that I am

12   not going to decide all your arguments, which I didn't even

13   count up how many arguments you made in your briefing, but I

14   think you made way more arguments than probably was

15   advisable.

16                   In any event, go ahead, Mr. Mishra.

17                   MR. FELDMAN:  This is Mr. Feldman.  I'll be

18   beginning.

19                   What I'd like to do is if I can split our time

20   between infringement and harm.  So I'll go through this

21   quickly, and I'll begin with infringement, Your Honor.

22                   THE COURT:  Sure.

23                   MR. FELDMAN:  I think it's important to quickly

24   get just an overview because it's been lost a bit about what

25   the '062 patent is really about.  Number one, it's about

1   remote control, controlling an exercise device from a remote

2   source.

3           Number two, it's about scaling control.  A user

4   making a change to that remote control signal.

5           So what does that look like?  It looks like

6   this.  You've got a coach somewhere, for example, in New

7   York, and you've got someone working out, as you can see in

8   this slide, somewhere in California, and the coach is saying

9   sending a control signal.  Speed to six miles an hour.

10  Incline to three.  And --

11          THE COURT:  So Mr. Feldman, for whatever it's

12  worth, I'm not seeing any slides.

13          MR. FELDMAN:  Oh, let's -- it was working during

14  our test run with your clerk.  Let me just try again.

15          Can you see it now, Your Honor?

16          THE COURT:  Yes.

17          MR. FELDMAN:  Okay.  Perfect.  So I'm just going

18  to show very briefly what the '062 patent is about.  You can

19  see here it's the coach in New York and someone working out

20  in California.  And Coach Joe in this example is saying, I'm

21  going to send this control signal.  Put Jane's exercise

22  device up to six speed, three incline, and then it's

23  controlling the device.  That's the remote control element

24  of the patent.

25          And then there's the scaling control which is

1    claim 47 that they claim is infringed.  What's that about?

2    Well, that's the person remotely -- yes, okay.  That is the

3    person Jane saying, You know what, I want to do less.  Make

4    it 66 percent.  And so when Coach Joe then says, Go to six

5    miles an hour and sends that control signal, it

6    automatically makes a proportional change to that control

7    signal.  Even though he's sending six, it brings her down to

8    66 percent just to four.  That's what the patent is about.

9    It's about remote control and scaling.

10           And that's simply not what the Bike+ does.  The

11   claim is about remote controlling and scaling control.

12   Bike+ is local control and actual resistance.

13           So let me talk about non-infringement briefly.

14   There are multiple sources that support non-infringement.

15   All the evidence you have in front of you, there's -- this

16   is basically clearly -- I'm sorry, I'm hearing feedback.

17           THE COURT:  I'm hearing some kind of feedback

18   going on.

19           MR. FELDMAN:  There we go.

20           THE COURT:  I'm not sure what that is.

21           MR. FELDMAN:  I think someone unmuted, but it

22   sounds like the problem is hopefully solved.

23           So can you hear me now, Your Honor? Your Honor,

24   can you hear me?

25           DEPUTY CLERK:  Judge, I think you're on mute.

1          THE COURT:  Yeah, sorry.  I put myself on mute

2    intentionally.

3          MR. FELDMAN:   Okay.

4          THE COURT:  And I was trying to send hand

5    signals, but apparently hand signals don't work or at least

6    the ones I was sending don't work.  But yes, I can hear you,

7    Mr. Feldman.  I'm going to put myself back on mute.

8          MR. FELDMAN:  Thank you very much.  So

9    Ms. Vivori is the authoritative source on this.  There was

10   some talk about at the beginning of the reply that she

11   couldn't be authoritative because she has a political

12   science degree.  She is the product owner of the feature.

13   She built it.  The COO of the company said she's the most

14   knowledgeable person.

15          There are four independent bases for

16   non-infringement here.  Auto-Follow controls resistance

17   locally.  Only one parameter is being controlled.  No

18   proportional change is made to a packetized control signal,

19   and there's already a license.

20          I just want to go through this quickly.  The

21   claim language specifically requires that there be remote

22   control.  You read ICON's opening brief.  They talked over

23   and over again about how what they thought was happening is

24   that the Peloton server is remotely controlling the Bike+.

25   Those were their words and that's what this claim requires.

1           It doesn't happen.  What actually happens very

2     briefly, Your Honor, the Auto-Follow software resides

3     locally on the Bike+.  There's no dispute about that.   All

4     the evidence shows that.

5           The Bike+ downloads and stores the Target

6     Metrics locally before the class begins completely, and then

7     the Bike+ local Auto-Follow software looks at that local

8     data and then makes changes to the resistance.  The only

9     remote signal that's ever happening to your class has

10    nothing to do with Auto-Follow.  There's video coming in

11    from a different server, and there's analytics going out.

12          You probably remember in the opening brief,

13    ICON's expert made a big deal about how he could tell that

14    Auto-Follow was actually being remotely controlled from the

15    Peloton server because when he toggled Auto-Follow on and

16    off, he saw that there was spikes in data.  That was a guess

17    because it was all encrypted.  It turns out that's

18    absolutely not true.

19          What he was seeing was analytic data that's

20    going back to Peloton's server.  He just couldn't see the

21    data.  It was encrypted.

22          Now, why is it so critical that everything

23    happens locally and that it's completely different than what

24    ICON has argued?  Well, number one, it's because the claim

25    language requires that remote control.  Claim 29C talks

1      about how the communicating mechanism receives a packetized

2      second signal from remote source over the network, and that

3      that packetized signal includes the control signal.  It's

4      also what ICON said over and over again in its brief.

5             But it's more than just that, Your Honor.  It's

6      also what ICON has said.  It cannot be credibly disputed

7      that using locally downloaded data to locally calculate

8      resistance changes is not infringing.

9             In fact, to defend the validity of its patent,

10     ICON's own expert, Dr. Easttom in his supplemental

11     declaration with the reply specifically said that the

12     packetized control signal from remote source must be

13     calculated remotely and then packetized from a remote

14     source.

15            And Your Honor, Target Metrics data, the JSON

16     file they're referring to isn't even a control signal.  They

17     admit, they just mentioned it, the JSON file is not

18     executable by itself.  It's raw data.  And the Bike+ then

19     uses that local raw data to calculate what the resistance of

20     the Bike+ should be.

21            And Dr. Easttom, as you can see on this slide in

22     the first part that's not highlighted to distinguish Studor,

23     explains that this is not covered by the claim.  He writes

24     here that Studor teaches packetized raw data, but not

25     packetized control signals.  Expressly saying that Studor

1    doesn't teach -- that Studor teaches what the Peloton Bike+

2    does.  It doesn't teach what their claim does.  And that,

3    Your Honor, is important.

4          It also mirrors what ICON told the United States

5    Patent Office.  And after their claim at issue here was

6    initially rejected by the examiner, to get over that, ICON

7    disclaimed controlling an exercise device with a local

8    computer based on the use of parameters stored on the local

9    computer.

10          So the issue of is Peloton Hickman -- are we

11   practicing Hickman, we haven't argued we're practicing

12   Hickman, but that's not the point.  It doesn't matter.  What

13   matters is what they have said to avoid invalidity of this

14   patent to the U.S. Patent Office is very clear, and what

15   they said to Your Honor in this Studor supplemental

16   declaration to get over that is clear.  They have disclaimed

17   what the Bike+ does.  And for that reason, there's no

18   infringement.

19          They chose to file this PI motion before getting

20   discovery, before seeking any other information, and they

21   guessed wrong.  That is the fact.

22          Now, I want to mention one other thing.  There

23   was talk in the briefing, they didn't mention it today, that

24   the real-time is the most important thing.  And that, you

25   know, Peloton is trying to read a real-time requirement into

1    this.

2           Well, first of all, we're not trying to read a

3    real-time requirement.  ICON itself, as you can see here

4    multiple times, argued specifically that the Bike+ is

5    controlled by the Peloton server, and that it matters

6    because this occurs in real-time.  And so we have rebutted

7    fundamentally that misunderstanding.

8           So that's what they said.  But either way,

9    Peloton doesn't infringe regardless of whether there's

10   real-time or not.  Again, it comes back to what I just

11   explained about what they have disclaimed.

12          With respect to Studor, they already said that

13   when there is raw data that's local that's being used to

14   calculate resistance for an exercise device, that isn't

15   covered.  They're avoiding that issue.  It's very, very

16   clear.  That's what they said to the Patent Office and

17   that's what bars them from showing a likelihood of success

18   on infringement on 29C.

19          29D, very quick, they can't meet that, either.

20   It says they have to be controlling operating parameters

21   plural.  There's only one parameter.  Everyone agrees, it's

22   resistance.  That's it.

23          And even if you were able to get past all of

24   that, they need to show that there's infringement of claim

25   47.  Very quickly, Your Honor, they can't show that, either.

1          Why?  There's no proportional change made to a

2    packetized control signal.

3          Number one, as I just explained, the Target

4    Metrics data, it's not a control signal.  It's just the JSON

5    file that is raw data that then the local Auto-Follow

6    software is reading.  And then at specific points if the

7    local software reads that local file, it makes the change.

8    It's not a control signal and that independently blows up

9    their infringement theory.

10          But on top of that, even if you assumed it was a

11   packetized control signal, it still doesn't matter for claim

12   47 for them because a user cannot change Target Metrics.

13   They cannot do what the '062 patent talks about.  Like I

14   showed you earlier, Jane saying, Make it 66 percent.  So

15   even though the resistance says 50 to a hundred, it's going

16   to scale me down to 30.

17          No.  You can never change Target Metrics, and

18   the logic files that we've presented to this Court show

19   that.  If you are on, taking a Bike+ Auto-Follow class, and

20   you get to -- you are in the 30 to 50 resistance range, and

21   you turn that knob and you just turn the actual resistance

22   down to 20.  When that instructor and the queue then goes

23   from 50 to 70, you don't get to go to 40.  It's not making a

24   proportional change.  It's actually snapping you right back

25   into the range.

1          And why?  Because you cannot make a proportional

2     change.  You cannot make any change to the Target Metrics.

3          We don't do what their opening brief and their

4     whole infringement theory and what the '062 patent says.

5     The red knob sets an actual resistance.  It does nothing

6     else.  No proportional change can be made.

7          Dr. Easttom agreed.  If you're just changing

8     actual resistance, which is all that red knob does, that's

9     not a proportional change, and so it doesn't work.  So they

10    can't show claim 47.  They can't show any of these things.

11         Very briefly, another point on infringement,

12    this has been briefed on the motion to dismiss in full, but

13    it's relevant here.  Peloton was already granted a license

14    to the '062 patent.  And a valid license is a complete

15    defense to infringement.  You have that before, Your Honor,

16    in the motion to dismiss, but the agreement is clear.

17         Under the section, Peloton's ability to use I

18    Fit functionality, we were granted a license to "the

19    asserted patents."  They've tried to argue in their

20    opposition that the asserted patents, Your Honor, should

21    read into that, insert the language claims of the asserted

22    patents to narrow it, but nothing in here says that it

23    should be narrowed.

24         The plain language shows that it's -- the

25    asserted patents of the '062 patent is incorporated by

1    reference no less than eight times in its entirety with no

2    limitations.  And the Federal Circuit has said where a party

3    incorporates a patent by reference into another, it's

4    effectively part of it.

5           Even if you don't agree with us that the plain

6    language justifies a full dismissal of the case, any factual

7    issues underlying that also counsel strongly in favor of

8    non-infringement.  So there are multiple reasons.  There are

9    huge significant questions about non-infringement in this

10   case that we believe justify in and of themselves shoving

11   down this preliminary injunction and denying it.

12          They simply cannot meet their burden.

13   Everything they thought in their opening brief turned out to

14   be wrong.

15          With that, I'd like to turn it over to my

16   colleague, Mr. Mishra, to address irreparable harm, if

17   that's okay with, Your Honor.

18          THE COURT:  Sure.

19          MR. MISHRA:  Good afternoon, Your Honor.

20   Sourabh Mishra on behalf of defendant, Peloton Interactive.

21          THE COURT:  Good afternoon.

22          MR. MISHRA:  Your Honor, we have a lot of

23   arguments on irreparable harm about why ICON has failed to

24   meet the showing to establish irreparable harm.  So I'm

25   going to focus during this argument on some of the points

1    ICON has made today and for the first time in their reply

2    brief, and focus on some arguments that ICON ignored in its

3    reply brief tellingly because there's no response to them

4    and that defeat the claim of irreparable harm.

5                So Your Honor, ICON today spoke a lot about how

6    this is just a two-player market.  The only two players are

7    ICON and Peloton.  But their own evidence contradicts that

8    point.  This is a dollar share report that ICON's witnesses

9    testified that it relies on in the ordinary course of

10   business.

11               What do you see in this dollar share report?  In

12   the Stationary Bike context, there are multiple brands that

13   are competing in this industry.  In fact, the other brands

14   category, 17.3 percent of the share is held by other brands,

15   more than the brands that ICON holds.

16               This isn't just two competitors in this

17   industry.  There are a lot more.

18               THE COURT:  Well, it depends what the industry

19   is; right?  They've said the market is, you know, fitness

20   something or another.  You know, stationary bikes is a much

21   bigger market and includes a wider range of things, doesn't

22   it?

23               MR. MISHRA:  Your Honor, in their opening brief,

24   they defined this as the relevant industry.  So in their

25   declarations, in their brief, they were -- they pointed the

1    Court to this dollar share report.  That's why we're using

2    the dollar share report in this presentation.

3              In reply, you're right.  They shifted.  They've

4    presented slide 4 in their presentation, and slide 4 they

5    showed a chart where Peloton in its internal presentation

6    identifies a host of different competitors.  And what they

7    said is, Your Honor, they say their main competitors are in

8    this space, at-home connected fitness.  But what they didn't

9    specifically point out in their presentation is that there

10   are numerous companies in that space.  So even --

11             THE COURT:  Well, right, but you say "numerous

12   companies."  I don't know exactly what the definition of a

13   oligopoly is.  But if two people control 90 percent of the

14   market, isn't that a oligopoly?  And isn't that, you know,

15   essentially a two-competitor market, notwithstanding the

16   fact that ten percent is miscellaneous other people?

17             MR. MISHRA:  Your Honor, that would be true if

18   people were only considering the two at-home connected

19   fitness products.  But what's true based on the evidence

20   that's been submitted in this case is that people have a

21   certain amount of money they want to spend on fitness

22   products.  So they have, let's say, $100 a month they want

23   to spend on fitness products.  They could spend that at the

24   gym or they could spend that with an at-home product.

25   They're making those decisions as I have in my life between

1      those two different sets of products.

2              ICON tries to narrow it to say, Well, people are

3      only going to consider at-home products -- people who want

4      to do at home are only going to consider these products, but

5      that's not the way that decisions are made by people when

6      they're choosing exercise products.  They're choosing from a

7      host of exercise offerings.

8              That's what this quadrant develops.  That

9      quadrant represents that Peloton is competing against all of

10     these offerings.  Even within this space, it's competing

11     against a host of different offerings.

12             So no, Your Honor, I don't agree that it's not a

13     oligopoly.  I agree that Peloton has a substantial share in

14     the market and ICON has less share in the market, but it's

15     not an oligopoly because there are a number of other

16     competitors that even ICON identifies in its briefing,

17     competitors like Echelon, like Tonal, like Hydrow.  These

18     are all other at-home connected fitness offerings that are

19     all competing in this space.

20             You know, another one that's competing in this

21     space is Nautilus which you'll see here.  Nautilus,

22     Bowflex, and Schwinn are all owned by the Nautilus company,

23     and they have an at-home connected fitness product, and they

24     have a digital offering.  And Nautilus with that digital

25     offering -- even though they have that digital offering,

1    ICON licensed the technology at issue in this case to

2    Nautilus.  So the idea that, you know, this is just a

3    two-player market, Your Honor, is not supported by the

4    evidence in this case.

5              And I want to go to one more slide.  This

6    really, I think, shows why ICON's litigation-free strategy

7    here or their argument here that it's a two-player market is

8    wrong.  We've cited publication after publication in this

9    case that are comparing trader products, other kinds of

10   exercise products with the connected fitness products that

11   are at issue in this case.

12             So a customer isn't going out there and saying,

13   I'm just going to look at ICON versus Peloton and decide

14   which products I want to buy.  They also look at indoor

15   trainer products, and they're -- again, we've cited article

16   after article after article on this point.

17             And again, and just to round out the licensing

18   point, ICON has licensed the '062 patent to Nautilus which

19   has a connected fitness offering.  ICON has licensed the

20   '062 patent to Saris which can be used with at-home

21   connected fitness offerings.  And ICON has licensed the '590

22   patent that incorporates the '062 patent to Echelon, which

23   again, has an at-home connected fitness offering.  So these

24   are all competitors in this space.

25             The next point I want to talk about, Your Honor,

1    is something that ICON ignored in its reply brief and that

2    all the harms that they're complaining of that they're going

3    to suffer before trial can all be calculated.  If all of

4    those harms can be calculated, a preliminary injunction

5    should not issue, no matter how great those harms may be.

6            So they offer four different types of harms:

7    Lost profits, lost market share, price erosion, lower IPO

8    valuation.  Now, let's talk about lost profits first.  Lost

9    profits without more presumed to be compensable through

10   damages, the Federal Circuit held multiple times, the lost

11   sales on their own cannot be a basis to find irreparable

12   harm.

13           In this case, the only actual examples ICON

14   provided of lost sales were already Peloton owners.  We

15   asked ICON's VP of marketing:  The three people that you

16   submitted there as examples of lost sales, they were already

17   planning to buy a Peloton bike, weren't they?  What did she

18   say?  Yes, that's correct.

19           The other examples they provide of lost sales,

20   same thing.  They were already buying Peloton Bike products,

21   decided to buy the Bike+ products.  That can't be a lost

22   sale to ICON.  It's a lost sale to Peloton's Bike, but it's

23   not a lost sale to the Bike+.

24           They also talk about lost convoyed sales.  And

25   they -- ICON provided seven different categories of alleged

1    loss of convoyed sales.  Here's the problem with the lost

2    convoyed sales argument.  We asked Ms. Logan, the VP of

3    marketing, if she had done any analysis to determine if

4    ICON's actually losing sales in any of those categories.

5    She said she didn't do any such analysis.  She testified

6    that the lawyers put it in her declaration, and she signed

7    the declaration.  She had not done any analysis there.

8            We asked ICON's damages expert, Did you examine

9    whether you could actually calculate these lost convoyed

10   sales at trial.  He said, I didn't go into that level of

11   specificity.  I didn't -- I didn't conduct that analysis.

12           Well, ICON in its briefing admitted that it can

13   calculate the subscriber length.  So what it can do is it

14   can say if somebody becomes an ICON subscriber, they're, on

15   average, going to be an ICON subscriber for nine years.

16           Similarly, they said -- this is from their

17   brief, Peloton -- if somebody becomes a Peloton subscriber,

18   they're going to stay with Peloton for 13 years.  So the

19   lost subscriber -- the lost profits relating to subscription

20   value is calculable.  ICON concedes that.

21           Now, why is that important?  Because all of the

22   other categories for convoyed sales such as nutrition, such

23   as sleep, such as apparel, such as warranty, they can all be

24   calculated based on that lost subscription value.  So if you

25   know how long somebody would have been a subscriber, and

1    ICON maintains this value per subscription for each of those

2    conveyed sales, all of these use damages can be calculated

3    at trial.

4            And Your Honor, this isn't Peloton's evidence.

5    This is information ICON keeps in its ordinary course of

6    business.  We asked Ms. Logan, the VP of marketing at ICON,

7    is this based on reliable data?  She said, Yes, we keep this

8    history.  We have this data, and it's reliable date that we

9    rely on in making our decisions at the company.

10           So this is not -- per ICON's allegation, this is

11   not speculation.  This is data that they keep in the

12   ordinary course of business.

13           Now, why is this even more relevant in this

14   case?  Because, Your Honor, the '062 patent expires in

15   February 2022.  Most likely, from our understanding from

16   Delaware practice, the earliest possible trial date will

17   occur after February 2022.  So the damages analysis that

18   will be conducted is only going to be looking at backward

19   data.  There's going to be no issue in calculating

20   forward-looking speculative information.

21           We're going to have all of this data at the time

22   of trial.  So all of these harms, if ICON's able to recover

23   for them, if it can show the necessary proof, will all be

24   historical and calculable at trial.

25           ICON talked a lot about lost market share and --

1            THE COURT:  Mr. Mishra, so one of the things

2    that I am curious about is basically let's say down the road

3    you're found to infringe, and the damages expert is saying

4    that, Well, okay, you got the sale of the bike, and we

5    didn't sell, you know, our bike which I guess cost less than

6    your bike.  But then we also didn't get the nine years of

7    membership which is, you know, nine times, I don't know,

8    $500 a year.  That's another $4,500.

9            I take it, is that a lost profits theory?  Is

10   that a reasonable royalty theory?  How are they going to

11   actually calculate that in damages?

12           MR. MISHRA:  Sure, Your Honor.  So it can be

13   both the lost profits theory and a reasonable royalty

14   theory.  And this issue came up at the deposition of

15   Peloton's expert, and what Peloton's expert testified is

16   that he's routinely calculated parts of these types of

17   conveyed sales as convoyed sales, as lost profits.

18           So as you know, under Federal Circuit law you

19   can calculate a peripheral sales of lost conveyed sales as

20   part of the lost profits analysis.  And that's what our

21   damages experts has done, and part of these, of course, can

22   be calculated as that.

23           They can also be calculated as part of a

24   reasonable royalty.  As part of the reasonable royalty

25   analysis, you use the Georgia-Pacific factors.  You look at

1   all of these other peripheral sales.  And because we already

2   have values from ICON's own data at the time of trial, since

3   everything is backward looking, we're going to be able to

4   put together a reasonable estimate through that reasonable

5   royalty of how much per product or per Bike+ sale ICON lost,

6   assuming that, you know, they've proven the merits of the

7   case.

8           Your Honor, unless you have more questions on

9   that, I want to talk a little about market share.

10          THE COURT:  Sure.

11          MR. MISHRA:  So their theory, ICON's theory on

12  market share changed between the opening brief and the reply

13  brief.  In their opening brief, they didn't actually have

14  any evidence of lost market share.  We even asked their

15  damages expert, do you have any evidence of lost market

16  share?  He said, No, I'm not aware of any data that would

17  provide that information.  It was on reply for the first

18  time that they introduced that kind of evidence.

19          And they introduced very selective evidence.

20  For example, here's a document Peloton submitted with its

21  PI.  It shows that ICON's growth has been consistently

22  growing, and you can see that from this chart.

23          Same thing.  This is not a Peloton document.

24  This is a third party.  And the third party said after the

25  release of the Bike+, Peloton hasn't gained share of the

1    at-home market.   Peers are seeing similar growth:   Nautilus,

2    NordicTrack, Echelon, Tonal.

3              As you'll see, they mention NordicTrack second,

4    not first in that listing.   Right.   So even third-party

5    analysts realize that this is not a duopoly.   There are many

6    different competitors here.

7              ICON instead points to this chart and says, Oh,

8    look, there was an increase in September, and so that must

9    be due to the Bike+.   First of all, Your Honor, what you can

10   see from this chart is market share fluctuates over time.

11   Peloton's highest market share was back in November 2019

12   before the pandemic.   That market share went down.   It went

13   up.   It went down.   It went up.   It naturally fluctuates.

14             And you can see that based on what happened in

15   October 2020.   In October 2020, again, Peloton's market

16   share declined.

17             Now, why did Peloton's market share increase

18   between August and September?   What ICON doesn't tell you is

19   what the COO of Peloton testified to.   And what he said is

20   Peloton very strategically in August of 2020 spent less

21   money on marketing, spent less money on promoting its

22   product because it knew it was going to have a huge release

23   in September.   It was going to come out with a lower priced

24   tread.   It was going to come out with a lower priced bike.

25   It was going to come out with this Bike+ with many enhanced

1    features, so it wanted to save up its advertising money.

2              And as you know, Your Honor, and as it's

3    commonly known, when you spend more on advertising, you're

4    going to get more sales.  The chart that ICON showed you

5    with the Bike sales and the Bike+ sales, what you'll see is

6    that there's a huge increase on the first date of release

7    since September.  And that's common.  If you asked Apple,

8    when is the highest sales for a new iPhone, they would say

9    on the day that the orders are first allowed to be accepted.

10   That doesn't mean that Apple suddenly gained substantial new

11   market share, it just means they had a surge in orders on

12   the first day that they're releasing a new product.

13             Peloton is a revolutionary company.  When it

14   releases new products, consumers want those new products.

15             What ICON is trying to get the Court to say is

16   just because there was a huge spike, it must have been

17   because of the Bike+, and it must have been because of the

18   Auto-Follow feature.  If you look --

19             THE COURT:  Mr. Mishra, you know, I realize

20   we're dealing with pretty recent history here, and I think

21   you earlier mentioned some anecdotes that ICON had first

22   brought up.  Has Peloton done any analysis of the Bike+

23   customers to see how many are essentially upgrading from

24   Bike?

25             MR. MISHRA:  Yes, Your Honor.  And this actually

1     is in our -- I would go back -- just in the sake of time,

2     I'm not going to go back to this slide right now, but yes,

3     this is in Mr. Malackowski's declaration filed with

4     Peloton's opposition.  And what it found was more than

5     50 percent of consumers who were buying the Bike+ had a

6     prior relationship with Peloton.  And a significant portion

7     of those people were people who were upgrading from the

8     Bike, both upgrading because they had a Bike previously, and

9     they decided to trade in that Bike to get a Bike+ which was

10    something Peloton had a special promotion on in September,

11    or they were somebody who had already ordered a Bike and

12    decided to buy the Bike+.  Again, that explains this kind of

13    increase in September, and that explains why we saw a

14    decrease in October.

15              THE COURT:  So does the Mr. Malackowski data

16    analysis say where the other 50 percent came from?

17              MR. MISHRA:  Well, yes.  It talks about other

18    referrals, for example, Your Honor.  So a lot of times a lot

19    of Peloton consumers, including myself, have Peloton because

20    our family and friends have Peloton.  So often times they

21    have referrals that come in.

22              There are other people who went to a Peloton

23    studio.  And in that studio they liked the Peloton product,

24    so they decided to buy the Peloton product.

25              So yes, he does discuss other reasons as well

1    for why.  And I would just point you to that Malackowski

2    declaration, Your Honor.

3                    THE COURT:  Okay.  That's good.  Thank you.

4                    MR. MISHRA:  So ICON -- so the market share --

5    the last point of my market share here, Your Honor, is that

6    any loss of market share is calculable here.  This is ICON's

7    own data that -- we have data about market share.  If you

8    look at the Federal Circuit case Mor-Flo that was cited in

9    our opposition, in that case the Federal Circuit said you

10   can calculate lost profits based on market share.  ICON can

11   do that at the time of trial, especially because all the

12   harms will be backward looking.

13                   By the way, one comment ICON keeps making is

14   that Peloton doesn't calculate market share for anything

15   other than this at-home connected fitness segment.  That's

16   entirely incorrect, Your Honor.  They took only a portion of

17   that slide in their presentation.  They left out the bottom

18   portion of the slide where Peloton has a calculation in a

19   broader fitness industry about what Peloton's market share

20   is in that industry.  So I would point you to the entire

21   slide there, Your Honor.

22                   Price erosion, ICON admitted today that it

23   doesn't have any evidence of price erosion.

24                   Lower IPO valuation, Peloton doesn't know when

25   its IPO is going to happen.  It hasn't started the process

1     of writing the IPO.  And our expert witness, which is

2     unrebutted, testified you can calculate damages based on a

3     lower IPO.

4              Last thing I want to talk about is nexus.  ICON

5     has established that without this -- with limited

6     Auto-Follow feature, the Bike+ would not be selling as well.

7     That's just not the case, Your Honor.

8              Here's a really important slide.  This slide

9     shows Peloton's growth and ICON's market share using ICON's

10    own data from July 2017 to July 2020.  Why is this

11    important?  Because during this time, Peloton's Bike product

12    did not have an Auto-Follow feature.  There was no

13    Auto-Follow feature.

14             The ICON product did have a remote control

15    feature.  So we had an ICON product with all the remote

16    control features that a consumer could want and a Peloton

17    product with no Auto-Follow.  And what do we see?  Peloton

18    grew from two percent to 58 percent.  ICON went from

19    12 percent to 10 percent.

20             This is significant evidence showing that

21    Auto-Follow or any kind of remote control feature is not a

22    significant driver of demand in this industry.  Consumers

23    choose Peloton because of Peloton's ecosystem.  And only

24    after that do they choose between the Bike and the Bike+ as

25    ICON's own evidence shows.  Consumers are choosing to go

1   from the Bike to the Bike+ or choosing the Bike over the

2   Bike+.  They're comparing those two products.

3            And industry analysts recognize the same as

4   well.  And the reason this is important, and Your Honor, I'm

5   going to point you to this slide, is one of the things ICON

6   alleges is because of Peloton's alleged infringement, ICON

7   can no longer differentiate its product.

8            That is wrong.  And the reason it's wrong is

9   because Peloton's Auto-Follow feature is much more limited

10  than ICON's technology.  Peloton is not on-demand classes.

11  It doesn't have automatic resistance control during live

12  classes.  It doesn't have automatic incline control.  It

13  doesn't have automatic decline control, and it doesn't have

14  an adaptive pulse that ICON says is coming.

15           Now, why do we know that this is correct?

16  Because Exhibit 1, Your Honor, to the Feldman declaration

17  filed with ICON's PI motion, Ms. Logan, ICON's declarant in

18  this case, told the Wall Street Journal that Peloton's

19  Auto-Follow is far more limited and that ICON's product is

20  where consumers should go if they want remote control

21  technology.  That's what she told the Wall Street Journal.

22  ICON should be held to that.

23           Now, ICON, finally, relies on this survey, and

24  they talked about the survey today.  Your Honor, this survey

25  was launched on November 5 after ICON filed its PI motion on

1   this day.  It was produced to us at 6:00 p.m. the day before

2   Ms. Logan's deposition.  That was the first time we saw this

3   survey.  The first time the survey came into the case was in

4   its reply brief.

5            This survey should not be considered because it

6   was untimely and ICON did not ask the Court for permission

7   to file new evidence in argument in its reply.  Moreover,

8   the survey should be excluded under Daubert.

9            The survey is fatally flawed because it's not

10  sponsored by an expert.  It came in through an attorney

11  declaration.  It came in through a deposition of an ICON

12  witness which I'll show shortly knew nothing about the

13  survey.  So because it doesn't have a sponsoring witness,

14  there's no expert witness with it, it should be disregarded.

15           It also suffers from extreme non-response bias.

16  The survey saw an eight percent response rate, and courts

17  hold that response rates below 50 percent serve as red flags

18  that the survey is not projectable.

19           The survey also lacks statements or substantial

20  guarantees of trustworthiness.  ICON didn't even produce to

21  us all of the answers to all of the questions.  They just

22  produced selective ones to us.  We could not even assess the

23  reliability of the survey, and the Court can't assess the

24  reliability of the survey because we don't even have the

25  full survey that was done for the purposes of litigation.

1          We asked Ms. Logan, the sponsoring witness, Did

2     you design the survey?  No.

3               Did you write the questions for the survey?  No.

4               Did you write the summary for the survey?  No.

5               Have you ever been admitted as a survey expert?

6     No.

7               Did you conduct any statistical analysis

8     relating to the survey?  No.

9               Did you know whether or not there was a control

10    group for this survey?  No.

11              ICON told you today at this hearing that a

12    statistically significant number percentage of people

13    responded, yet there is no witness.  There is nothing in the

14    record establishing any statistical significant number or

15    anything establishing the reliability of the survey.  The

16    survey should be disregarded in its entirety.

17              With that, Your Honor, I believe I'm at the

18    limit.  So unless you have any further questions, I'll stop.

19              THE COURT:  All right.  You are at the limit.

20    Okay.  Thank you, Mr. Mishra.

21              All right.  Can I just see, I guess,

22    Mr. Feldman.  Wait.  No, no, no.  Sorry.  I can't tell who's

23    on which side.

24              What's the name of plaintiff's attorney?

25              MR. WRIGHT:  That's David Wright, Your Honor.

1            THE COURT:  Mr. Wright, so this survey that

2    Mr. Mishra just said is not sponsored by any expert, in

3    fact, do you agree with that?

4            MR. WRIGHT:  I do -- the company internal

5    consumer insights research using a Qualtrics platform, the

6    company does it all the time, that survey happened to be

7    completed.  When it was, which was I think November 15th or

8    16 of this year, but, yeah, I would agree with respect to

9    that survey, they cite to the Dentsply case, Your Honor.

10   And Your Honor's probably familiar with the Reference Manual

11   on Scientific Evidence.

12           THE COURT:  No, I have it, but I've never read

13   it.

14           MR. WRIGHT:  Okay.  Well, that's published by

15   the Federal Judicial --

16           THE COURT:  No, I know what it is.

17           MR. WRIGHT:  Dentsply relied on the Second

18   Edition, Your Honor.  The Third Edition says this rate

19   issue, rate percentage issue is no longer a relevant

20   consideration.  So Dentsply --

21           THE COURT:  I believe there was a Fourth

22   Edition.

23           MR. WRIGHT:  There probably is, Your Honor, but

24   Dentsply's reliance on the Second Edition with respect to

25   the rate or the sponsor rate is really not persuasive

1   anymore in terms of --

2          THE COURT:  Well, so you said, I think, during

3   your presentation that the response was statistically

4   significant.  I take it you were using that in a laymen's

5   sense, not because somebody who is a Ph.D. in statistics or

6   even slightly less than that said so; is that right?

7          MR. WRIGHT:  That's correct, Your Honor.  Just

8   the observation that and probably based on my experience in

9   litigation having a response by 2,400 people is significant.

10  I use that in a laymen's term.

11          THE COURT:  Okay.  All right.  So why don't you

12  all hold on the line here for just a minute.  I will leave

13  my chair and I will be back in a minute.  Okay?

14          (Recess was taken.)

15          THE COURT:  All right.  I'm back.  Am I

16  correct, Mr. Mishra or Mr. Feldman, that in the last half

17  hour when you all were speaking, we didn't decide the part

18  where Mr. Mishra was speaking about irreparable harm.

19          What Mr. Feldman chose to address was basically

20  various non-infringement defenses, not the invalidity

21  defenses that are in the briefing; is that right?

22          MR. FELDMAN:  That is correct, Your Honor.

23  Simply in the interest of time, we can address them.  We

24  felt like there was hundreds of pages of briefing, plus the

25  IPR petition and so we focused on --

1          THE COURT:  Well, so here's the thing about the

2    hundreds of pages of briefing.  I don't actually regard what

3    was -- you know, there's a reason why we have briefs.  You

4    know, ICON started it off by saying, Well, here's our

5    infringement theory in a sentence.  Go read the declaration.

6    You know, that's not the way to proceed.

7          But then Peloton has raised literally a host of

8    issues, and I'm not entirely sure what I'm going to do here.

9    And when I say Peloton's raised a host of issues, what I

10   really mean to say is in terms of infringement and

11   invalidity, the merits, there's a host of issues raised.

12   Some of them seem to be incredibly conclusory in the

13   briefing which, after all, for Peloton it's really 25 pages

14   total.  And I think for ICON, it was 30 pages total.

15         So it's been very helpful, I think, to hear

16   particularly Peloton's argument here today.  But what I

17   would like you to do, Mr. Feldman, is I don't feel

18   obligated, if I'm ruling against you, to decide every issue

19   that you've raised in a sentence in the briefing.  I don't

20   think that's right.

21         So what I'd like you to do is, you know, think

22   about it with whoever you need to think about it with or,

23   you know, get their input, and send me a letter by the end

24   of tomorrow specifying in rank order what your three best

25   merits-related arguments are, in your opinion, which can be,

1    you know, three non-infringement theories or whatever it is

2    you think they are.  And the narrower you make them, the

3    more I will be able to concentrate on what they are.

4              In other words, you know, if you want to say

5    that there's not a packetized signal because of the JSON or

6    whatever -- well, actually just be specific as to what they

7    are because whatever you put in that letter, that's what

8    we're going to focus on.

9              Do you understand what I have in mind?

10             MR. FELDMAN:  Yes, Your Honor.  Just to make

11   sure I fully understand, do you want us to name what they

12   are and direct you to those specifically in the preview, or

13   do you want us to specifically submit a full submission

14   with --

15             THE COURT:  No, really all I want is a letter

16   that should not be much more than a page and a half saying,

17   you know -- because in the limited amount of briefing we

18   have, I can find where you made the arguments, but -- so I'm

19   not looking for new arguments.

20             MR. FELDMAN:  Sure.

21             THE COURT:  I'm not looking for even citations

22   to old arguments.  I'm really just looking for, you know,

23   here's the three things on the merits because I feel a

24   little bit differently about the hardship or the irreparable

25   harm.  You know, I think the briefing on that is a lot more

1    helpful and less conclusory in terms of focusing on the

2    issue, but I think the merits briefing is just, you know,

3    just tons of arguments that are not flushed out at all.  And

4    so I figured -- and what you've said today has been helpful

5    in, I think, pointing me at what you think your strongest

6    arguments are, but maybe I'm wrong.  So I'd like to give you

7    the chance to tell me what you think I should be focusing

8    on.

9              MR. FELDMAN:  Thank you, Your Honor.  I

10   appreciate that.  It will not be longer than that, and we'll

11   get that submitted by tomorrow.

12             THE COURT:  Okay.  All right.  Well, that's all

13   I have for today, and I've got something else in five

14   minutes.  So I want to thank you.  Both sides' presentations

15   have helped to focus in on some of the issues, and so for

16   that, I appreciate it.  And I hope to get a little more

17   focus from Mr. Feldman's letter, and then we'll see what we

18   can do on this.

19             Okay?  So everyone have a nice holiday and thank

20   you very much.  I'm going to hang up now.

21             (Everyone said, Thank you, Your Honor.)

22             (Oral argument was concluded at 3:25 p.m.)

23             I hereby certify the foregoing is a true and

24   accurate transcript from my stenographic notes in the

25   proceeding.

```
1                    /s/ Heather M. Triozzi
                     Certified Merit and Real-Time Reporter
2                    U.S. District Court

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```